ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| MILAGROS LÓPEZ COTTO APELANTE V. BAYAMÓN MEDICAL CENTER APELADO | KLAN202201000 | *Apelación* Procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón |
|---|---|---|
| | | Civil Núm.: BY2022CV00899 Salón: 501 |
| | | SOBRE: Laboral, Despido Injustificado, Represalias (Ley 115), Discrimen (Ley 100) Ley Núm. 44-1985 (Protección a Impedidos) |

Panel integrado por su presidente el Juez Sánchez Ramos, el Juez Rivera Torres y el Juez Salgado Schwarz.

Salgado Schwarz, Carlos G., Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 29 de febrero de 2024.

Comparece ante nos, la Sra. Milagros López Cotto (señora López Cotto o Apelante) mediante el presente recurso de *Apelación*. Solicita la revocación de la *Sentencia Sumaria* emitida y notificada el 29 de noviembre de 2022 por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI o foro recurrido). A través del referido dictamen, el TPI desestimó con perjuicio una *Querella* sobre despido injustificado, discrimen y represalias presentada por la Apelante en contra de Bayamón Medical Center (BMC o Apelada). El foro recurrido destacó que el despido de la señora López Cotto fue conforme a derecho y que, a raíz de ello, la Apelada no se veía en la obligación de remunerar a la Apelante

en concepto de mesada ni por los daños exigidos en la reclamación.

Por las razones que exponemos a continuación, **confirmamos** la *Sentencia* apelada. Veamos.

-I-

La controversia ante nos tiene su génesis el **1 de marzo de 2022** con la presentación de una querella[1] por la señora López Cotto en contra de BMC. La referida acción fue al amparo del procedimiento sumario que provee la Ley Núm. 2 de 17 de octubre de 1961, conocida como la *Ley de Procedimiento Sumario de Reclamaciones Laborales* (Ley Núm. 2).[2] En su reclamación, la Apelante alegó que BMC había violentado las disposiciones de una amplia gama de leyes.[3]

En específico, la señora López Cotto argumentó que trabajó como enfermera graduada en BMC desde el año 1987 y que, debido a una intervención quirúrgica en sus cervicales, tuvo que recibir tratamiento médico por medio del Seguro de Incapacidad No Ocupacional (SINOT), por lo cual permaneció en descanso durante un (1) año. Además, expuso que el **4 de febrero de 2022**, tras agotar dicho beneficio, BMC se negó a proveerle acomodo razonable para continuar en su empleo y, en cambio, procedió a despedirla injustificadamente.

---

[1] Apéndice del Recurso, págs. 1-4.
[2] 32 LPRA sec. 3118 *et seq.*
[3] Ley Núm. 100 de 30 de junio de 1959, conocida como la *Ley contra el Discrimen en el Empleo,* 29 LPRA sec. 146 *et seq.*; Ley Núm. 44 de 2 de julio de 1985, conocida como la *Ley para Prohibir el Discrimen Contra las Personas con Impedimentos Físicos, Mentales o Sensoriales,* 1 LPRA sec. 501 *et seq.*; *Americans with Disabilities Act,* 42 USC sec. 1201.; Ley Núm. 80 de 30 de mayo de 1976, conocida como la *Ley Sobre Despidos Injustificados,* 29 LPRA sec. 185a *et seq.*; Ley Núm. 115 de 20 de diciembre de 1991, conocida como la *Ley de Represalias contra el Empleado por Ofrecer Testimonio,* 29 LPRA sec. 194 *et seq.*; y la Ley Núm. 139 de 26 de junio de 1968, conocida como la *Ley de Beneficio por Incapacidad Temporal,* 11 LPRA sec. 201, *et seq.*

El **9 de marzo de 2022**, BMC presentó su *Contestación a Querella*.[4] En esencia, argumentó que la Apelante agotó su licencia médica bajo SINOT sin recuperarse de su incapacidad. Por lo cual, debido a que la Apelante no podía efectuar las tareas básicas del puesto, el 8 de febrero de 2022, efectuó la terminación de empleo de esta, conforme lo provee el Art. 2.16 de la Ley Núm. 4 de 26 de enero de 2017, conocida como la *Ley de Transformación y Flexibilidad Laboral* (Ley Núm. 4).[5]

El **29 de julio de 2022**, tras varios eventos procesales, y tras concluir el descubrimiento de prueba, BMC presentó una *Moción de Sentencia Sumaria*.[6] Expuso que, a base de los hechos, de la prueba documental y del derecho aplicable, procedía que se dictase sentencia a su favor y se desestimara las reclamaciones instadas en su contra.

El **9 de agosto de 2022**, la señora López Cotto presentó una *Oposición a Solicitud de Sentencia Sumaria* y, además, presentó su propia petición solicitando que se dictara sentencia sumaria concediendo su reclamación.[7]

Posteriormente, luego de que BMC replicara la moción presentada por la Apelante, el TPI emitió una *Sentencia* y desestimó con perjuicio la *Querella*.[8] En síntesis, el foro primario concluyó que la terminación de empleo de la señora López Cotto se realizó conforme a derecho y que la razón expuesta por el patrono para despedirla fue justificada.

---

[4] Apéndice del Recurso, págs. 5-26.
[5] 29 LPRA sec. 122o(e).
[6] Apéndice del Recurso, págs. 27-382.
[7] *Id.*, págs. 383-723.
[8] *Id.*, págs. 750-771.

El 29 de noviembre de 2022, el TPI emitió la *Sentencia* recurrida, en la que determinó que procedía dictar sentencia de forma sumaria y formuló las siguientes determinaciones de hechos:

1. La Sra. Milagros López Cotto trabajó para BMC como enfermera graduada del Departamento de Medicina/Telemetría.

2. La Sra. Milagros López Cotto nació el 30 de diciembre de 1969, teniendo 52 años a la fecha del despido.

3. La Sra. Milagros López Cotto acusó recibo de su Descripción de Deberes como Enfermera Graduada de BMC el 5 de noviembre de 2020.

4. En su Descripción de Deberes, se requiere al enfermero:

   (1) Esfuerzo físico moderado de levantar y/o mover hasta cincuenta libras;

   (2) Estar de pie o caminar frecuentemente y por periodos prolongados;

   (3) Levantar, posicionar, empujar y/o transferir pacientes frecuentemente;

   (4) Levantar y/o mover pacientes;

   (5) Esfuerzo intermitente al realizar tratamiento;

   (6) Ejercer juicio y acción en situaciones en las que depende la vida de un paciente;

   (7) Entre otras.

5. Como empleada de BMC, la Sra. Milagros López Cotto tenía que cumplir con los deberes descritos en su Descripción de Deberes como Enfermera Graduada. Además, tenía que estar capacitada para atender sus necesidades.

6. Estas funciones son una condición de empleo en BMC. Las mismas son de extrema importancia, porque la vida y la salud de los pacientes dependen de ellas.

7. La Sra. Milagros López Cotto trabajaba para un piso Triple M. Eso es un piso que es bien

fuerte. Se atendían entre veintiocho (28) y treinta (30) pacientes con dos (2) enfermeras graduadas y una enfermera práctica.

8. Como enfermera, la Sra. Milagros López Cotto tenía que estar capacitada y apta para atender cualquier emergencia que pudiera surgir en el hospital.

9. Ante un arresto cardiaco de un paciente, corresponde al enfermero graduado a cargo del paciente tirar una clave, llevar el carrito al cuarto del paciente y comenzar a dar las compresiones al paciente.

10. El carro de paro tiene jeringuillas, medicamentos, monitores cardiacos, sueros y los instrumentos de canalizar al paciente.

11. El carro de paro tiene que tener todo este equipo porque, ante una emergencia, el enfermero graduado no se puede ir al área de enfermería porque se puede arrestar el paciente.

12. La Sra. Milagros López Cotto tenía que estar capacitada para utilizar este carrito [en] situaciones de arresto cardiaco de sus pacientes.

13. El carro de paro tiene un peso de 187 libras.

14. La Sra. Milagros López Cotto también tenía que estar capacitada para trabajar con transfusiones de sangre de sus pacientes. Este proceso implicaba recoger la sangre en el Banco de Sangre de BMC y administrársela al paciente.

15. La Sra. Milagros López Cotto trabajaba en el piso ocho (8) de BMC. El Banco de Sangre de BMC está en el "lobby" de otra torre o edificio.

16. El Hospital es quien escoge el área de trabajo de sus empleados, según las necesidades de servicio.

17. En relación a las admisiones, la enfermera graduada tiene que estar capacitada para recibir el paciente, ver cómo llegó, ir

con el carrito de los signos vitales, si el paciente no camina, tiene que estar capacitada para ayudarlo a pasarse de la camilla a la cama; luego se hace el historial, si tiene dolor, se deja cómodo, con barandas elevadas, y va al "counter" a proceder con la admisión.

18. Todas las funciones que tiene un enfermero practico en el proceso de admisión, el enfermero graduado tiene que estar capacitado a hacerla.

19. Las funciones de un enfermero graduado en BMC le requieren estar en constante movimiento, aunque no necesariamente las ocho (8) horas.

20. Para poner suero, transfusiones de sangre y todo lo que se inyecte por vena (IV), tiene que utilizarse un stand de aproximadamente seis (6) pies que está al lado de la cama del paciente porque tiene que estar a altura.

21. La Sra. Milagros López Cotto mide 5'3" y el "stand" del suero es más alto que ella.

22. Antes de su operación, la Sra. Milagros López Cotto podía levantar más de cincuenta (50) libras de peso. Pero ahora, luego de su operación, no puede hacerlo por orden de su médico.

23. La Sra. Milagros López Cotto fue operada el 4 de febrero de 2020.

24. Luego de ser orientada, la Sra. Milagros López Cotto completó una solicitud de beneficios bajo SINOT que fue aprobada, con un periodo de incapacidad inicial del 4 de febrero de 2021 al 1 de mayo de 2021.

25. El 10 de mayo de 2021, la Sra. Milagros López Cotto fue revaluada por su médico quien le recomendó terapia física y una nueva revaluación el 16 de agosto de 2021.

26. El 16 de agosto de 2021, luego de su revaluación, la Sra. Milagros López Cotto fue mantenida en descanso médico para ser evaluada por un fisiatra.

27. El 7 de septiembre de 2021, el Dr. Fausto Boria Carcaño (Fisiatra), emitió un certificado médico a la Sra. Milagros López Cotto donde le autorizaba a trabajar, con restricciones.

28. El certificado médico del 7 de septiembre de 2021 establecía lo siguiente: "Paciente puede trabajar con limitaciones. No levantar o cargar más de 20 libras; no manipular o cargar sobre el nivel de los hombros".

29. El 8 de septiembre de 2021, la Sra. Milagros López Cotto presentó en BMC el certificado médico del Dr. Fausto Boria Carcaño (Fisiatra) donde solicitaba regresar a sus labores, con restricciones.

30. En el Departamento de Recursos Humanos se le informó a la Sra. Milagros López Cotto que el certificado médico no se podía aceptar porque no tenía el diagnóstico con los números y las limitaciones, ni indicaba la fecha, desde, hasta.

31. El 28 de septiembre de 2021, la Sra. Milagros López Cotto presentó en BMC un nuevo certificado médico del Dr. Fausto Boria Carcaño (Fisiatra) que establecía lo siguiente: "La presente es para informar que la paciente en referencia puede trabajar con limitaciones. No levantar o cargar más de 20 libras; no manipular o cargar sobre el nivel de los hombros".

32. En atención a la certificación médica entregada, la Sra. Milagros López Cotto fue orientada en BMC sobre su solicitud de acomodo razonable el 29 de septiembre de 2021.

33. Luego de su orientación, el Dr. Frankie Báez Matos, completó el Cuestionario Médico del Hospital para la solicitud de acomodo razonable.

34. Al completar el cuestionario médico requerido, el médico de la querellante informó al Hospital lo siguiente:

(1)     Describa    la(s)    condicione(es) medica(s) de la paciente: La Sra. López Cotto padece de estenosis espinal…

(2)     Estime el tiempo que durar(án) dichas condiciones y detalle los factores que puedan afectar esto: la condición es permanente y esfuerzo físico de moderado a severo pueden afectar la condición…

(5)     Adjunto la Descripción de Puesto del empleado(a):

    a.     Capacidad de estar de pie √

    b.     Capacidad de estar en movimiento √

    c.     Extender los brazos por encima del hombro √

    d.     Movimientos repetitivos con las manos √

    e.     Capacidad para empujar peso de más de 30 libras √

    f.     Capacidad de alar peso de más de 30 libras √

    g.     Capacidad para levantar peso de más de 30 libras √

**Por favor indique con una marca de cotejo (√) y sus iniciales aquellas tareas de la Descripción de Puesto del empleado(a) y las arriba especificadas, que el empleado NO puede realizar por su condición médica.** En la medida que el empleado(a) pueda cumplir con las funciones allí detalladas, certifíquelo marcando en el encasillado correspondiente. Certifico que el empleado(a) puede cumplir con todas las funciones de su puesto.

(6)     Explique como la condición médica del paciente impide o dificulta el que pueda realizar las tareas identificadas como parte de la contestación a la pregunta anterior: **la condición médica de**

**la paciente se empeorará y hasta un potencial significativo de que la paciente se pueda lastimar al realizar las tareas arriba descritas.**

(10)   Indique si en su mejor criterio la condición de su paciente, o el tratamiento que está recibiendo, representa o podría representar un riesgo a su seguridad, o a la salud o seguridad de otros, de este trabajar en el puesto arriba indicado. De contestar en la afirmativa explique: Sí, al someter a la paciente a realizar las tareas descritas en la pregunta #5 esto podría hacer que la paciente se lastime o que poco a poco su condición empeore limitando más sus actividades diarias.

35.   Además de evaluar el aludido Cuestionario Medico, de BMC se comunicaron con el Dr. Frankie Báez sobre lo expuesto en el documento.

36.   El Dr. Báez le indicó al personal de BMC que la condición de la Sra. López Cotto es permanente y que su capacidad para estar de pie, en movimiento y realizar movimientos repetitivos es limitada. Incluso mencionó que existía posibilidad de que lo mejorado por la Sra. Milagros López Cotto en su cirugía se pudiera afectar y echar para atrás si ejercía las funciones no recomendadas en su empleo.

37.   El 11 de noviembre de 2021, se le envió una comunicación a la Sra. Milagros López Cotto donde se le informó que no era viable concederle un acomodo razonable, dado a su incapacidad de realizar las funciones de su puesto de enfermería de forma segura para sí, y de forma segura para los pacientes de la institución.

38.   A la Sra. Milagros López Cotto también se le comunicó que su reserva de empleo bajo SINOT estaría vigente hasta el 4 de febrero de 2022.

39. Luego de recibir esta carta, la Sra. Milagros López Cotto no tuvo ninguna comunicación adicional con el Hospital, hasta el 8 de febrero de 2022. Es decir, entre el 11 de noviembre de 2021 y el 8 de febrero de 2022, BMC no recibió ninguna información o cambio en las limitaciones médicas de la Sra. Milagros López Cotto.

40. El empleo de la Sra. Milagros López Cotto concluyó el 8 de febrero de 2022.

Inconforme con dicha determinación, el **9 de diciembre de 2022**, la Apelante compareció ante esta Curia y expuso los siguientes señalamientos de error:

**Primer error:** Erró el Honorable Tribunal de Instancia de Bayamón al resolver a base del Artículo 2.16 de la Ley Núm. 4 de 2017 y no a base de la Ley 80 de 1976.

**Segundo error:** Erró el Tribunal de Primera Instancia de Bayamón al no hacer determinaciones de hechos en cuanto a la fecha de contratación de la querellante e ignorar todos los hechos alegados por la querellante en su oposición a la solicitud de sentencia sumaria y solicitud de sentencia sumaria parcial sobre hechos controvertidos.

**Tercer error:** Erró el Tribunal de Primera Instancia de Bayamón al no hacer determinaciones de por qué la Querellante no es una persona cualificada bajo la Ley ADA y Ley 44 de 1991.

Resumidos los hechos que originan la presente controversia, examinemos el derecho aplicable.

-II-

A.

Al revisar una determinación de un tribunal de menor jerarquía, **los tribunales tenemos la tarea principal de auscultar si se aplicó correctamente el**

**derecho a los hechos particulares del caso**.[9] Como regla general, los foros apelativos no debemos intervenir con las determinaciones de hechos de los tribunales de primera instancia, su apreciación sobre la credibilidad de los testigos y el valor probatorio conferido a la prueba presentada en sala, pues solo contamos con "récords mudos e inexpresivos".[10] Lo anterior, se fundamenta en la premisa de que el foro primario es quien tiene la oportunidad de escuchar a los testigos declarar y apreciar su *"demeanor"*.[11] Sin embargo, **la norma de deferencia antes esbozada encuentra su excepción y cede** cuando la parte promovente demuestra que: "[h]ubo un **craso abuso de discreción o que el tribunal actuó con prejuicio y parcialidad**, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial".[12] (Énfasis nuestro).

Por discreción se entiende el "tener poder para decidir en una forma u otra, esto es, para escoger entre uno o varios cursos de acción".[13] No obstante, "el adecuado ejercicio de la discreción está inexorable e indefectiblemente atado al concepto de la razonabilidad".[14] A esos efectos, el Tribunal Supremo de Puerto Rico ha enumerado situaciones que constituyen un abuso de discreción:

> [c]uando el juez, en la decisión que emite, no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; cuando por el

---

[9] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013).
[10] *Id.*, págs. 770-771; *SLG Rivera Carrasquillo v. AAA*, 177 DPR 345, 356 (2009); *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007).
[11] *Colón v. Lotería*, 167 DPR 625, 659 (2006).
[12] *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689, 709 (2012).
[13] *García v. Asociación*, 165 DPR 311, 321 (2005).
[14] *Id.*

contrario el juez, sin justificación y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en el mismo; o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez livianamente sopesa y calibra los mismos.[15]

En cambio, si la actuación del tribunal no está desprovista de base razonable, ni perjudica los derechos sustanciales de una parte, debe prevalecer el criterio del juez de instancia a quien corresponde la dirección del proceso.[16] En ese sentido, las conclusiones de derecho son revisables en su totalidad por los tribunales apelativos.[17]

Ahora bien, **la norma de deferencia antes esbozada no es de aplicación a la evaluación de la prueba pericial y documental**. En lo que respecta a las conclusiones de hecho basadas en prueba pericial o documental, los foros revisores nos encontramos en igual posición que los tribunales sentenciadores para apreciarla y adoptar nuestro propio criterio.[18] Incluso, podemos descartarla, aunque sea técnicamente correcta.[19]

**B.**

Según la normativa antes expuesta, los tribunales apelativos, de ordinario, aceptan "como correctas las determinaciones de hechos de los tribunales de instancia, al igual que su apreciación sobre la credibilidad de los testigos y el valor probatorio de la

---

[15] *Ramírez v. Policía de PR*, 158 DPR 320, 340-341 (2002).
[16] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013); *Sierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).
[17] *Dávila Nieves v. Meléndez Marín*, *supra*, pág. 770.
[18] *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011); *Arrieta v. De la Vega*, 165 DPR 538, 551 (2005).
[19] *Id.*

prueba presentada en sala".[20] A pesar de ello, en ocasiones, la deferencia al arbitrio del juzgador de los hechos no es absoluta.[21] De manera, que:

> [a]unque alguna prueba sostenga las determinaciones de hechos del tribunal, si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas.[22]

Por otro lado, en cuanto a las determinaciones de hecho y conclusiones de derecho, la Regla 42.2 de Procedimiento Civil apunta que: "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos".[23]

Dicho de otro modo, las determinaciones de hechos basadas en la credibilidad conferida por el juzgador a los testigos que declaren ante sí merecen gran deferencia.[24] Por tanto, nuestra intervención con la evaluación de la prueba testifical procede únicamente cuando un análisis integral de la misma "nos cause una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia".[25] De ahí, que nuestro reglamento establece que cuando una parte señale algún error relacionado con la suficiencia de la prueba testifical o la apreciación errónea de la misma,

---

[20] *Dávila Nieves v. Meléndez Marín*, *supra*, pág. 771.
[21] *Id.*
[22] *Id.*, pág. 772.
[23] 32 LPRA Ap. V, R. 42.2.
[24] *SLG Rivera Carrasquillo v. AAA*, *supra*, pág. 356.
[25] *Rivera Menéndez v. Action Service*, 185 DPR 431, 444 (2012).

deberá someter una transcripción, exposición estipulada o narrativa de la prueba.[26]

En cuanto a la evaluación y suficiencia de la prueba, la Regla 110 de Evidencia establece los principios que el juzgador deberá evaluar a la hora de determinar cuáles hechos quedaron establecidos.[27] En lo que nos concierne, la mencionada regla preceptúa que:

> (A)  El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes.
> (B)  La obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en el asunto en controversia.
> (C)  Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza.
> (D)  La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho[.]
> (E)  […]
> (F)  En los casos civiles, la decisión de la juzgadora o el juzgador se hará mediante la preponderancia de la prueba a base de criterios de probabilidad[.][28]

En otras palabras, le corresponde al tribunal determinar si la prueba desfilada es suficiente para establecer la veracidad de los hechos alegados.[29] Así las cosas, no basta con formular meras alegaciones o teorías, pues estas no constituyen prueba.[30] Respecto al valor probatorio que le otorgarán los tribunales a los testimonios periciales, la Regla 702 de Evidencia señala que:

> [e]l valor probatorio del testimonio dependerá, entre otros, de:
>
> > (A)   si el testimonio está basado en hecho o información suficiente;

---

[26] Regla 19 (A) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 19 (A). Véanse, además, Reglas 19 (B), 20, 76 (A) y (E).
[27] 32 LPRA, Ap. VI, R. 110.
[28] *Id.*
[29] *Belk v. Martínez*, 146 DPR 215, 231 (1998).
[30] *UPR v. Hernández*, 184 DPR 1001, 1013 (2012); *Pereira Suárez v. Jta. Dir. Cond.*, 182 DPR 485, 510 (2011).

(B)  si el testimonio es el producto de principios y métodos confiables;

(C)  si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;

(D)  si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;

(E)  las calificaciones o credenciales de la persona testigo, y

(F)  la parcialidad de la persona testigo.[31]

La citada regla establece una serie de factores que inciden sobre el valor probatorio del testimonio pericial, cuyo fin último es ayudar al juzgador a entender determinada prueba o hecho en controversia.[32] De modo, que: "el juzgador de hechos no está obligado a aceptar las conclusiones de un perito. Por lo tanto, si luego de aquilatar el testimonio pericial, el juzgador concluye que no merece credibilidad, este tiene la facultad de rechazarlo".[33]

### C.

En nuestro ordenamiento jurídico el mecanismo de sentencia sumaria se rige por la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, en síntesis dispone que para poder adjudicar en los méritos una moción de sentencia sumaria lo que se requiere es que se presente "una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente" ya sea sobre la totalidad de la reclamación o parte de ésta.

---

[31] 32 LPRA, Ap. VI, R. 702.
[32] E. Rivera García, *El valor del testimonio pericial en los procesos judiciales,* 47 Rev. Jur. U. Inter. P.R. 87, 99-100 (2013).
[33] *Id.,* pág. 101.

Quien promueve la sentencia sumaria "debe demostrar que no existe controversia sustancial o real en cuanto a algún hecho material, es decir, en cuanto a ningún componente de la causa de acción."[34] Un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable."[35] Por otra parte, quien se opone a una sentencia sumaria debe presentar contradocumentos y contradeclaraciones que contradigan los hechos incontrovertidos por parte del promovente.[36] Por lo cual viene obligada a contestar de forma detallada la solicitud de sentencia sumaria.

El mecanismo procesal de la sentencia sumaria es un remedio de carácter extraordinario y discrecional, el cual tiene como finalidad "propiciar la solución justa, rápida y económica de litigios civiles que no contengan controversias genuinas de hechos materiales."[37] Sin embargo, hay que aclarar que aligerar la tramitación de un caso no puede soslayar el principio fundamental de alcanzar una solución justa.[38]

Por ser la sentencia sumaria un remedio de carácter discrecional, "[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido proceso de ley."[39]

---

[34] *Meléndez González v. M. Cuebas*, 193 DPR 100, 110 (2015).
[35] Cuevas Segarra, *op. cit.,* pág. 609.
[36] *Rivera et al. v. Superior Pkg., Inc. et al.,* 132 DPR 115,133 (1992).
[37] *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 128 (2012).
[38] *García Rivera et. al. v. Enríquez*, 153 DPR 323, 337-338 (2001); *Cuadrado Lugo v. Santiago Rodríguez,* 126 DPR 272, 279 (1990).
[39] *Mgmt. Adm. Servs. Corp. v. E.L.A.*, 152 DPR 599, 611 (2000).

Siendo esto así, sólo procede que se dicte la sentencia sumaria "cuando surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el Derecho aplicable y el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia."[40] De haber alguna duda acerca de la existencia de una controversia sobre los hechos medulares y sustanciales del caso, deberá resolverse contra la parte que solicita la moción, haciendo necesaria la celebración de un juicio.[41]

Se ha pautado que "[l]os jueces no están constreñidos por los hechos o documentos evidenciarios que se aduzcan en la solicitud de sentencia sumaria" y que "[d]eben considerar todos los documentos en autos, sean o no parte de la solicitud, de los cuales surjan admisiones que hagan las partes."[42]

Según se ha establecido jurisprudencialmente el tribunal apelativo se encuentra en la misma posición que el tribunal de primera instancia al determinar si procede una sentencia sumaria. Sin embargo, al revisar la determinación de primera instancia, el tribunal de apelación está limitado de dos maneras:

1. s[o]lo puede considerar los documentos que se presentaron ante el foro de primera instancia; y

2. el tribunal apelativo s[o]lo puede determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. No puede adjudicar los hechos materiales esenciales en disputa.[43]

---

[40] *Meléndez González v. M. Cuebas*, *supra*, págs. 109-110
[41] *Rivera et al. v. Superior Pkg., Inc. Et al*, *supra.*
[42] *Vera v. Dr. Bravo*, 161 DPR 308, 333 (2004).
[43] *Id.,* págs. 334-335.

El deber de adjudicar hechos materiales y esenciales es una tarea que le compete al Tribunal de Primera Instancia y no al foro revisor debido a que está impedido de hacerlo. Por consiguiente, el Tribunal Supremo de Puerto Rico en *Meléndez González et al. v. M. Cuebas*, *supra*, estableció el estándar que debemos utilizar como tribunal revisor al momento de evaluar determinaciones del foro primario en las que se conceden o deniegan mociones de sentencia sumaria. En lo pertinente, dispuso que "[l]a revisión del Tribunal de Apelaciones es una *de novo* y debe examinar el expediente de la manera más favorable a favor de la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario."[44] Además, reiteró que por estar en la misma posición que el foro primario, debemos revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma recopilados en la Regla 36 de Procedimiento Civil.[45]

Luego que culminemos nuestra revisión del expediente, de encontrar que en realidad existen hechos materiales y esenciales en controversia, debemos tener en cuenta que el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, *supra*, y debe exponer concretamente cuáles hechos materiales encontró que están controvertidos y cuáles están incontrovertidos, es decir, cuales no están en controversia. En lo pertinente, establece lo siguiente:

> Si en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito […] y es necesario celebrar juicio, será obligatorio

---

[44] *Id*. pág. 118.
[45] *Id.*

que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos […]"[46]

Esta determinación puede hacerse en la Sentencia que disponga del caso y puede hacer referencia al listado de hechos incontrovertidos que emitió el foro primario en su Sentencia.[47] Por el contrario, de resultar que los hechos materiales y esenciales realmente están incontrovertidos, entonces nos corresponde revisar *de novo* si el TPI aplicó correctamente el derecho a los hechos incontrovertidos.[48]

A su vez, la Regla 36.3 de Procedimiento Civil, *supra*, dispone como sigue:

> La sentencia solicitada será dictada inmediatamente si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que como cuestión de derecho el tribunal debe dictar sentencia sumaria a favor de la parte promovente.

Un Tribunal "abusa de su discreción cuando actúa de forma irrazonable, parcializada o arbitraria."[49] Por tanto, corresponde al Tribunal conceder o denegar, en el ejercicio de su discreción, los remedios correspondientes de acuerdo con las circunstancias del litigio.

### D.

La Ley Núm. 2 provee un procedimiento sumario de reclamaciones laborales para la rápida consideración y adjudicación de las querellas de obreros y empleados

---

[46] 32 LPRA Ap. V, R. 36.4.
[47] *Id.*
[48] *Meléndez González et al. v. M. Cuebas*, *supra*, pág. 119.
[49] *Matías Lebrón v. Depto. Educación*, 172 DPR 859, 875 (2007).

contra sus patronos que estén relacionadas a salarios, beneficios y derechos laborales.[50] Dichas reclamaciones ameritan ser resueltas a la brevedad posible para así lograr los propósitos legislativos de proteger el empleo, desalentar los despidos injustificados y proveerle al obrero despedido medios económicos para su subsistencia mientras consigue un nuevo empleo.[51]

La naturaleza de este tipo de reclamación exige celeridad en su tramitación, pues de esta forma se adelanta la política pública de proteger al obrero y desalentar el despido injustificado.[52] Con el fin de adelantar su propósito, la ley estableció:

> (1) términos cortos para la contestación de la querella presentada por el obrero o empleado; (2) criterios para la concesión de una sola prórroga para contestar la querella; (3) un mecanismo para el emplazamiento del patrono querellado; (4) el procedimiento para presentar defensas y objeciones; (5) criterios para la aplicación de las Reglas de Procedimiento Civil; (6) una limitación específica sobre el uso de los mecanismos de descubrimiento de prueba; (7) una prohibición específica de demandas o reconvenciones contra el obrero o empleado querellante; (8) la facultad del tribunal para dictar sentencia en rebeldía cuando el patrono querellado no cumpla con los términos provistos para contestar la querella, y (9) los mecanismos para la revisión y ejecución de las sentencias y el embargo preventivo.[53]

En cuanto a la alegación responsiva del querellado, la Sec. 3 de la Ley Núm. 2, *supra*, dispone: "El querellado deberá hacer una sola alegación responsiva en la cual deberá incluir todas sus defensas y objeciones, entendiéndose que renuncia a todas las defensas u

---

[50] 32 LPRA sec. 3118; *Vizcarrondo Morales v. MVM, Inc.*, 174 DPR 921, 928 (2008).
[51] *Id.*
[52] *Izagas Santos v. Family Drug Center*, 182 DPR 463, 480 (2011).
[53] *Rivera v. Insular Wire Products Corp.*, 140 DPR 912, 923-924 (1996); *Patiño Chirino v. Parador Villa Antonio*, 196 DPR 439, 446 (2016).

objeciones que no incluya en dicha alegación responsiva".[54]

De otra parte, el andamiaje legislativo en el ámbito laboral reconoce que el trabajo es un elemento central, tanto por lo que significa a nivel individual en la vida diaria de la ciudadanía como por el beneficio colectivo que se genera cuando, a través del esfuerzo, ofrecemos calidad de vida y desarrollo social y económico para nuestro país.[55] A través de nuestra jurisprudencia, también se ha reconocido que en dicha dinámica la persona empleada es aún la parte más débil. Tomando en cuenta ello, se han aprobado una serie de estatutos con el fin de "proteger el empleo, regular el contrato de trabajo, y asegurar la salud y seguridad del obrero".[56]

## E.

Los remedios provistos por nuestro ordenamiento jurídico para las situaciones en que un empleado es despedido sin justa causa varían dependiendo de la naturaleza del contrato de empleo de que se trate, a saber: si el contrato es a término fijo, a tiempo indeterminado, o si están presentes ciertas circunstancias que tiendan a indicar la creación de una expectativa de continuidad en el empleo o de un contrato por tiempo indeterminado *bona fide*. En el caso de un trabajador contratado por término determinado, este tendrá a su disposición la presentación de una causa de acción civil en contra de su patrono por daños y perjuicios contractuales.[57] Sin embargo, **de tratarse de**

---

[54] 32 LPRA sec. 3120. Véase, además, *Izagas Santos v. Family Drug Center, supra.*
[55] *Rivera Figueroa v. The Fuller Brush Co., 180 DPR 894 (2011).*
[56] *Id.*, pág. 903.
[57] *Nazario v. Miguel P. Vélez & Asociados*, 145 DPR 508 (1998).

**un empleado contratado por tiempo indeterminado, la Ley Núm. 80 es el estatuto que provee los remedios exclusivos para la actuación ilegal de parte del empleador.**[58]

La Ley Núm. 80 fue aprobada por la Asamblea Legislativa como parte del interés apremiante del Estado de regular las relaciones obrero-patronales y evitar prácticas injustas en el empleo.[59] El esquema que establece esta legislación tiene como propósito proteger al empleado de actuaciones arbitrarias del patrono e imponer remedios económicos que desalienten la práctica de despedir a los empleados injustificadamente.[60]

El Artículo 1 de la Ley Núm. 80 dispone que los empleados de un comercio, industria o negocio que están **contratados sin tiempo determinado**, que reciben remuneración y son despedidos de su cargo sin que medie justa causa tienen derecho al pago de una compensación, conocida comúnmente como la mesada.[61]

Empero, lejos de prohibir el despido de forma absoluta, la Ley Núm. 80 se limita a imponerle al patrono un elemento disuasivo para no despedir al trabajador sin justa causa.[62] En otras palabras, un patrono puede despedir a un empleado sin causa justificada alguna, pero estará sujeto al pago de una mesada al agraviado por la acción tomada.[63]

Por su parte, el Artículo 2 de la Ley Núm. 80, establece las razones que se consideraran justa causa para el despido de un empleado de su empleo, a saber:

---

[58] *Biver v. Cooperativa Federal De Empleados Telefónicos*, 145 DPR 165, 168 (1998).
[59] *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364, 374 (2001).
[60] *Romero et als. v. Cabrera Roig et als.*, 191 DPR 643, 649-650 (2014).
[61] 29 LPRA sec. 185a.
[62] *Romero et als. v. Cabrera Roig et als., supra,* pág. 651.
[63] *Id.*

(a) Que el empleado o empleada siga en un patrón de conducta impropia o desordenada.

(b) La actitud del empleado o la empleada de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.

(c) Violación reiterada por el empleado o empleada de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado o empleada.

(d) Cierre total, temporero o parcial de las operaciones del establecimiento.

(e) Los cambios tecnológicos o de reorganización, o la naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.[64]

Mientras tanto, el Artículo 5 de la Ley Núm. 80 define el término despido de la siguiente forma:

[…] [S]e entenderá por despido, además de la cesantía del empleado(a), su suspensión indefinida o por un término que exceda de tres (3) meses, excepto en el caso de empleados(as) de industria y negocios estacionales, o la renuncia del empleo motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar, tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarle en categoría o someterle a vejámenes o humillaciones de hecho o de palabra.[65]

Con el fin de asegurar su naturaleza protectora, las reclamaciones tramitadas al amparo de la Ley Núm. 80 favorecen con una presunción de despido injustificado al empleado querellante.[66] Así, una vez el patrono interpone como defensa afirmativa que hubo justa causa para el

---

[64] 29 LPRA sec. 185b.
[65] 29 LPRA sec. 185e.
[66] *Rivera v. Pan Pepín*, 161 DPR 681, 690 (2004); *Díaz v. Wyndham Hotel Corp.*, *supra*, pág. 378; *Belk v. Martínez*, 146 DPR 215, 230-231 (1998).

despido, entonces tiene que probar, por preponderancia de la prueba, que el despido no fue ilegal.[67]

Cabe destacar que, si bien la Ley Núm. 80 establece claramente que el incumplimiento del empleado con los reglamentos internos de una empresa, de ordinario, hacen que el despido sea justificado, no se dispone cual sería el efecto de que sea el patrono el que incumpla con estas normas. Ante dicha laguna legislativa, la jurisprudencia ha tenido que atender este vacío. Así pues, en *Santiago v. Kodak Caribbean, LTD*, el Tribunal Supremo de Puerto Rico dispuso que los beneficios y privilegios establecidos en los reglamentos de una empresa constituyen derechos de los empleados de la entidad y un despido en violación a estas reglas resultaría en una destitución sin justa causa.[68]

**F.**

Advertimos que la Ley Núm. 4 de 26 de enero de 2017, conocida como la *Ley de Transformación y Flexibilidad Laboral*, con vigencia inmediata, enmendó varios artículos de la Ley Núm. 80. No obstante, el estatuto dispone en su Art. 1.2 que su aplicación es prospectiva. En específico establece que: "[l]os empleados contratados con anterioridad a la vigencia de esta Ley, continuarán disfrutando los mismos derechos y beneficios que tenían previamente, según lo dispuesto expresamente en los Artículos de [e]sta".[69] Es decir, la aplicación de la Ley Núm. 4 es prospectiva, cuando así se incorpora expresamente en el estatuto.

El Art. 2.16 de la Ley Núm. 4 regula la extinción del contrato de empleo.

---

[67] *Díaz v. Wyndham Hotel Corp.*, *supra*, pág. 378.
[68] *Santiago v. Kodak Caribbean, Ltd.*, 129 DPR 763, 776 (1992).
[69] 29 LPRA sec. 121(a).

El contrato de empleo, a menos que se disponga de otra manera en una ley especial, se extinguirá por:
(a) mutuo acuerdo de las partes;
(b) las causas consignadas en el contrato de empleo;
(c) la expiración del tiempo convenido o realización de la obra o servicio objeto del contrato;
(d) la renuncia o abandono del trabajo por parte del empleado;
**(e) muerte o incapacidad del empleado más allá del periodo de reserva de empleo dispuesto en** una ley especial;
(f) jubilación o retiro del empleado;
(g) cambio de patrono, salvo exista un acuerdo entre las partes o una ley en sentido contrario;
(h) despido del empleado, o;
(i) incumplimiento con normas de conducta.[70]

**G.**

La Ley Núm. 115 busca proteger a los empleados de acciones en su contra por ofrecer información o testimonio en ciertos foros, tales como investigaciones legislativas, procesos administrativos o procedimientos judiciales.[71] Asimismo, esta legislación tiene un alcance amplio y aplica a empleados de la empresa privada, municipios y todos los empleados del gobierno, incluyendo aquellas instrumentalidades que funcionan como negocios o empresas privadas.[72]

Para lograr su cometido, el Artículo 2 de la Ley Núm. 115 dispone lo siguiente:

(a) Ningún patrono podrá despedir, amenazar o discriminar contra un empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, así como el testimonio, expresión o información que ofrezca o intente ofrecer, en los procedimientos internos establecidos de la empresa, o ante cualquier empleado o representante en una posición de autoridad, cuando dichas

---

[70] 29 LPRA sec. 122o.
[71] 29 LPRA sec. 194.
[72] *Cordero Jiménez v. Universidad de Puerto Rico*, 188 DPR 129 (2013).

expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley.

(b) Cualquier persona que alegue una violación a esta Ley podrá instar una acción civil en contra del patrono dentro de tres (3) años de la fecha en que ocurrió dicha violación y solicitar se le compense por los daños reales sufridos, las angustias mentales, la restitución en el empleo, los salarios dejados de devengar, beneficios y honorarios de abogado. La responsabilidad del patrono con relación a los daños y a los salarios dejados de devengar, será el doble de la cuantía que se determine causó la violación a las disposiciones de esta Ley.

(c) El empleado deberá probar la violación mediante evidencia directa o circunstancial. El empleado podrá además establecer un caso prima facie de violación a la ley probando que participó en una actividad protegida por esta Ley y que fue subsiguientemente despedido, amenazado o discriminado en su contra de su empleo. Una vez establecido lo anterior, el patrono deberá alegar y fundamentar una razón legítima y no discriminatoria para el despido. De alegar y fundamentar el patrono dicha razón, el empleado deberá demostrar que la razón alegada por el patrono era un mero pretexto para el despido.[73]

De esta forma, el inciso (c) del Artículo 2 de la Ley Núm. 115 establece el esquema probatorio que regirá en las causas instadas al amparo de sus disposiciones. En esencia, la ley dispone de dos vías para que los empleados establezcan una causa de acción por represalias: (1) la directa, en la que el empleado debe probar su caso mediante de evidencia directa o circunstancial, suficiente para demostrar un nexo causal entre su conducta y el daño sufrido; o (2) la indirecta, en la que deberá establecer un caso *prima facie* de represalias mediante evidencia que demuestre que participó en una actividad protegida por la Ley Núm. 115

---

[73] 29 LPRA sec. 194a.

y que fue subsiguientemente despedido, amenazado o discriminado.[74] En esta segunda forma, el carácter de "subsiguiente" puede establecerse por medio de un criterio de proximidad temporal, lo cual implica que se puede configurar un caso *prima facie* probando que la acción adversa ocurrió al "poco tiempo" del empleado haber participado en la actividad protegida.[75] Ahora bien, en los casos en que la proximidad temporal no sea el factor más adecuado para establecer la causalidad, el empleado el empleado deberá probar que: (1) fue tratado de forma distinta a otros empleados; (2) que existió un patrón de conducta antagónica en su contra; (3) que las razones articuladas por el patrono para fundamentar su acción adversa están plagadas de inconsistencias, o (4) cualquier otra evidencia que obre en el expediente para establecer el elemento del nexo causal.[76]

En resumen, la escueta Ley Núm. 115 crea una presunción *juris tantum* de violación a sus disposiciones a favor del empleado, puesto que este establece un caso *prima facie* tan pronto evidencie que participó en una actividad protegida y que fue subsiguientemente despedido, amenazado o discriminado en el empleo.[77] Una vez esto ocurre, el patrono deberá alegar y fundamentar que tuvo una razón legítima y no discriminatoria para la acción adversa.[78] Logrado esto, el empleado aún puede prevalecer si prueba que la razón alegada por el patrono es un mero pretexto para el despido discriminatorio.[79]

---

[74] *Rivera Menéndez v. Action Service*, 185 DPR 431, 445 (2012).
[75] *Id.*, pág. 446.
[76] *Feliciano Martes v. Sheraton,* 182 DPR 368, 398 (2011).
[77] *Id.*, citando a *Marin v. Fastening Systems, Inc.*, 142 DPR 499 (1997).
[78] *Id.*
[79] *Id.*

**H.**

La Ley Núm. 100 fue creada para "ofrecer una eficaz protección a los trabajadores contra diversos tipos de discrimen en el ámbito laboral".[80] Esta legislación, en esencia, prohíbe que un patrono despida, suspenda o discrimine a un empleado por razón de edad, raza, color, sexo, origen social o nacional, condición social, afiliación política, ideas políticas o religiosas, o por ser víctima de violencia doméstica, agresión sexual o acecho.[81]

El esquema procesal dispuesto requiere que el obrero establezca: (1) que hubo un despido o acto perjudicial; (2) que la acción del patrono fue injustificada; y (3) algún hecho que lo ubique dentro de la modalidad de discrimen bajo la cual se reclama.[82] Cuando se cumple con esta etapa inicial, el peso de la prueba se traslada al patrono, quien deberá presentar prueba suficiente para rebatir la presunción establecida.[83]

Se presume que la actuación del patrono ha sido discriminatoria cuando ha sido efectuada sin justa causa. El patrono tiene el peso de refutar dicha presunción.[84] Si el empleado establece un caso *prima facie* de discrimen, el patrono debe: (1) presentar prueba que derrote el hecho básico, esto es, la alegación de que no hubo justa causa; (2) destruir el hecho presumido, esto es, la alegación de que el despido fue debido a un discrimen; o (3) presentar prueba para atacar

---

[80] *Mestres Dosal v. Dosal Escandón*, 173 DPR 62, 68 (2008).
[81] *Id.*, pág. 69.
[82] *Ramírez Ferrer v. Conagra Foods P.R.*, 175 DPR 799, 815 (2009).
[83] *Id.*
[84] *Ibáñez v. Molinos de Puerto Rico*, 114 DPR 42, 50-52 (1983).

o destruir ambos hechos.[85] Entonces, si el patrono cumple con esta segunda etapa procesal, el empleado debe continuar su caso sin la presunción y con evidencia concreta que pruebe que realmente hubo un discrimen ilegal.[86] Por tanto, "[s]egún este supuesto estaríamos entonces ante una reclamación ordinaria en la que el empleado tiene la obligación de presentar evidencia que sustente su causa de acción".[87]

El Tribunal Supremo ha determinado que en los casos en que se alega discrimen por razón de edad bajo las disposiciones de la mencionada Ley Núm. 100, el empleado tiene que probar, no solo que hubo un despido injustificado, sino también que, independientemente de su edad, **estaba calificado para ocupar el puesto del cual fue despedido** y que fue sustituido por una persona de menor o mayor edad, según sea el caso.[88] El Art. 6 de la Ley Núm. 100 define edad como "cualquier edad desde la edad mínima en que legalmente se permita trabajar a los menores, de acuerdo con la ocupación o industria de que se trate, sin límite alguno".[89]

Siendo esto así, ha quedado establecido que la edad no es un factor decisivo para determinar si un empleado está o no cualificado para realizar las labores de un empleo. Consecuentemente, no constituye discrimen el único hecho de tener edad avanzada o ser extremadamente joven, dentro del marco legal para obtener un empleo.[90]

---

[85] *Ramos Pérez v. Univisión,* 178 DPR 200, 222 (2010), citando a *Ramírez Ferrer v. Conagra Foods P.R., supra.*
[86] *Ramos Pérez v. Univisión, supra.*
[87] *Id.,* págs. 222-223.
[88] *Mestres Dosal v. Dosal Escandón, supra,* pág. 72; *Sandoval Rivera v. Caribe Hilton International,* 149 DPR 582, 585 (1999).
[89] *Mestres Dosal v. Dosal Escandón, supra,* pág. 72.
[90] *Id.*

**I.**

La Ley Núm. 44 de 2 de julio de 1985, según enmendada, se adoptó con el objetivo de garantizar la igualdad en circunstancias en las cuales personas con discapacidad física, mental o sensorial enfrentan tratos discriminatorios que limitan su oportunidad de participar, desempeñarse y competir adecuadamente en el campo laboral.[91]

La referida Ley Núm. 44 fue enmendada mediante la aprobación de la Ley Núm. 105 de 20 de diciembre de 1991 con el propósito de atemperar nuestro estatuto con la Ley Pública Federal de 26 de julio de 1990, 29 USCA secs. 706 y ss., conocida comúnmente como ADA. Esta enmienda introdujo la obligación de todo patrono de proveerle acomodo razonable en el lugar de trabajo, a las personas con impedimentos.[92]

El acomodo razonable puede incluir, el proveer facilidades accesibles y disponibles para personas con impedimentos, rediseño del trabajo, modificación de horario de trabajo, reasignar a una posición vacante, y aquellos otros acomodos similares para personas con impedimentos.[93] La responsabilidad de tomar dicha acción afirmativa es de tal envergadura que solo se exime a un patrono de su cumplimiento en casos en que el acomodo

---

[91] 1 LPRA sec. 501 et seq.; *Guardiola Álvarez v. Depto. de la Familia,* 175 DPR 668 (2009).
[92] *García v. Darex P.R. Inc.*, 148 DPR 364, (1999).
[93] 42 U.S.C. § 12111(9)(A) y (B). The term "reasonable accomodation" includes:

> A)making existing facilities used by employees readily accessible to and usable by individuals with disabilities and, B)job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipments or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities"

requerido resulte en un esfuerzo económico extremadamente oneroso.[94]

El Art. 1 de la Ley Núm. 44, define algunos términos contenidos en la misma. A continuación, exponemos el significado de los siguientes términos:

"(b) **Acomodo razonable**- significará el ajuste lógico adecuado o razonable que permite o faculta a una persona cualificada para el trabajo, con limitaciones físicas, mentales o sensoriales ejecutar o desempeñar las labores asignadas a una descripción o definición ocupacional. Incluye ajustes en el área de trabajo, construcción de facilidades físicas, adquisición de equipo especializado, proveer lectores, ayudantes, conductores o intérpretes y cualquier otra acción que razonablemente le facilite el ajuste a una persona con limitaciones físicas, mentales o sensoriales en su trabajo y que no representa un esfuerzo extremadamente oneroso en términos económicos.

Significará, además, la adaptación, modificación, medida o ajuste adecuado o apropiado que deben llevar a cabo las instituciones privadas y públicas para permitirle o facultarle a la persona con impedimento cualificada a participar en la sociedad e integrarse a ella en todos los aspectos, inclusive, trabajo, instrucción, educación, transportación, vivienda, recreación y adquisición de bienes y servicios.

(d) **Persona con impedimentos físicos, mentales o sensoriales**- Significará toda persona con un impedimento de naturaleza motora, mental o sensorial, que le obstaculice o limite su inicio o desempeño laboral, de estudios o para el disfrute pleno de la vida y que está cualificada para llevar a cabo las funciones básicas de ese trabajo o área de estudio, con o sin acomodo razonable.

Se entenderá, además, que es una persona con impedimentos bajo la protección de este capítulo, toda aquella persona cuyo impedimento le limite sustancialmente su desempeño en una o más actividades principales del diario vivir; que la persona tenga un historial previo de esa condición o se le

---

[94] *Guardiola Álvarez v. Depto. De la Familia*, *supra*.

considere como que tiene dicho impedimento aun cuando no lo tiene.

Para los propósitos de este capítulo se considerará como impedimento sensorial aquel que afecte sustancialmente, la audición, visión, tacto, olfato y el habla."[95]

[…]

El Art. 5 de la Ley Núm. 44, prohíbe que tanto las instituciones públicas como las empresas privadas ejerzan, pongan en vigor o usen procedimientos, métodos o prácticas discriminatorias de empleo por razón de impedimentos físicos, mentales o sensoriales por el mero hecho del tal impedimento. La prohibición incluye desde la etapa de reclutamiento hasta la compensación, los beneficios marginales y las facilidades de acomodo razonable y accesibilidad, antigüedad, participación en programas de adiestramiento, promoción y cualquier otro término, condición o privilegio en el empleo. [96]

Un empleado que alegue estar cobijado por la Ley Núm. 44, para que su patrono esté obligado a brindarle acomodo razonable según dispone la referida ley, tiene que demostrar: primero, que es una persona con impedimento según lo define la ley, y segundo, que **está cualificado para llevar a cabo las funciones básicas de ese trabajo**, con o sin el acomodo razonable.[97]

Una vez, el empleado ha formalizado una solicitud de acomodo razonable, el patrono viene obligado a iniciar un proceso interactivo con dicho empleado para analizar si resulta posible conceder el remedio solicitado y la forma en que puede concederse el mismo. La petición de acomodo razonable no requiere que sea por

---

[95] 1 LPRA sec. 501.
[96] 1 LPRA sec. 505.
[97] *Morales Bengochea v. Banco Popular*, 173 DPR 74 (2008); García v. Darex P.R., *supra*.

escrito o cualquier otra forma en especial, basta que el patrono advenga en conocimiento de la necesidad del empleado de un acomodo razonable.[98]

La única excepción por la cual un patrono no está obligado bajo la Ley ADA y la Ley Núm. 44 a realizar un acomodo razonable, es si el mismo le representa un esfuerzo extremadamente oneroso ("*undue hardship*").[99] No obstante, la evaluación sobre, si el acomodo razonable constituye un esfuerzo extremadamente oneroso, descansa principalmente en la naturaleza y costo del acomodo necesario, los recursos financieros de la entidad, el número de empleados, y el efecto de los gastos y recursos o el impacto en las operaciones de las facilidades.[100]

Se requiere que la Ley Núm. 44 sea interpretada de la "forma más beneficiosa para las personas con impedimentos, por lo que el Art. 14 de la susodicha ley dispone que todas las ramas gubernamentales y las

---

[98] *Morales Bengochea v. Banco Popular, supra*., citando; A. Acevedo Colom, *Legislación Protectora del Trabajo comentada*, págs.285-286 7ma Edición, 2007.

[99] 42 U.S.C. 12111 § 12111 (10)(A); 1 LPRA sec. 507a, respectivamente.

[100] 42 U.S.C sec.12111 (10)(B):

>    (10) Undue hardship
>    **(A)** In general
>    The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).
>    **(B)** Factors to be considered
>    In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include -
>    **(i)** the nature and cost of the accommodation needed under this chapter;
>    **(ii)** the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>    **(iii)** the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>    **(iv)** the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

personas naturales o jurídicas, al interpretar esta legislación, deben utilizar una interpretación liberal y no restrictiva. Se precluye la utilización, como precedente reductor del alcance de los derechos de las personas con impedimentos, de toda decisión de un tribunal o una agencia administrativa federal que interprete o haya interpretado de una manera restrictiva y contra los intereses de las personas con impedimentos la Ley Pública Federal de 26 de julio de 1990, conocida como *The Americans with Disabilities Act"*.[101]

Por otra parte, el empleado demandante deberá presentar suficiente evidencia que demuestre lo siguiente: (a) que es una persona incapacitada según definido en la Ley ADA o la Ley Núm. 44; (b) **que podía llevar a cabo las funciones esenciales de su puesto con o sin acomodo razonable;** y (c) que aun conociendo el patrono de la incapacidad de la parte demandante, éste no hizo un esfuerzo razonable para proveer el acomodo solicitado.[102]

El demandante tiene el peso de la prueba para demostrar que solicitó el acomodo razonable de forma precisa o suficiente. La solicitud deberá ser: (1) suficientemente directa y específica y (2) deberá explicar cómo el acomodo solicitado está relacionado con la incapacidad.[103]

Además, el demandante deberá probar que el acomodo solicitado es razonable, que **le permitirá llevar a cabo las funciones esenciales de su puesto,** y que es viable que el patrono lo conceda. Si el demandante cumple con

---

[101] 1 LPRA sec. 511a.
[102] *EEOC v. Kohl´s Dept. Stores, Inc.,* 774 F 3d 127 (2014); *Freadman v. Metro. Prop. and Cas. Inc. Co.,* 484 F .3d 91, 102(1st Cir.2007).
[103] *Freadman v. Metro. Prop. and Cas. Inc. Co., supra.*

probar lo antes mencionado, el demandado deberá probar que el acomodo es una petición excesivamente onerosa.[104]

**J.**

El derecho de todo trabajador a la "protección contra riesgos para su salud o integridad personal en su trabajo o empleo" se encuentra consagrado en la sección 16 del Artículo II de nuestra Constitución.[105] A dichos efectos se aprobó la Ley 139 de 26 de junio de 1968, según enmendada, 11 LPRA sec. 201 *et seq.* ("Ley Núm. 139"), la *Ley de Beneficios por Incapacidad Temporal*, mejor conocida como "SINOT". Esta ley establece un plan de beneficios por incapacidad temporera para sustituir la pérdida de salarios como consecuencia de incapacidad debido a enfermedad o a un accidente que no esté relacionado con el empleo. En lo pertinente a la controversia de marras, la Sección 202(j)(6)(Q) de esta ley dispone que el término *empleo* no incluirá:

> El servicio prestado como empleado de una corporación, institución, sociedad, asociación, fundación o cualquier fondo comunal o cualquier otra organización descrita en la sec. 501(c)(3) del Código de Rentas Internas de Estados Unidos creados y administrados exclusivamente para fines religiosos, caritativos, científicos, literarios o educativos, o para la prevención de la crueldad con los niños o con los animales, ninguna parte de cuyas utilidades netas redunde en beneficio de algún accionista o individuo particular; siempre que dicha organización esté exenta de contribución sobre ingresos bajo la sec. 501(a) del Código de Rentas Internas. Esta exención no será extensiva al servicio prestado en relación con la construcción, demolición, ampliación, remodelación o reparación sustancial de edificios y otras obras análogas.

En cuanto a la reserva de empleo y la obligación de reinstalación, en los casos de incapacidad, conforme a

---

[104] *Id.*
[105] Const. PR, Art II., § 16.

la Sección 203(q) de la Ley 139-1968, *supra*, el patrono vendrá obligado a reservar el empleo que desempeña el trabajador al momento de comenzar la incapacidad y a reinstalarlo en el mismo sujeto a lo siguiente:

(1) Que el trabajador requiera al patrono que lo reponga en su empleo dentro del término de quince (15) días, contados a partir de la fecha en que fuere dado de alta, y siempre y cuando que dicho requerimiento no se haga después de transcurridos doce (12) meses desde la fecha de comienzo de la incapacidad o seis (6) meses en el caso de patronos con quince (15) empleados o menos a la fecha de la incapacidad;

**(2) que el trabajador esté mental y físicamente capacitado para ocupar dicho empleo en el momento en que solicite del patrono dicha reposición**, y

(3) que dicho empleo subsista al momento en que el trabajador solicite su reposición. Se entenderá que el empleo subsiste cuando el mismo esté vacante o lo ocupe otro trabajador. Se presumirá que el empleo estaba vacante cuando el mismo fuere cubierto por otro trabajador dentro de los treinta (30) días siguientes a la fecha en que se hizo el requerimiento de reposición.

Si el patrono no cumpliera con las disposiciones de este inciso, vendrá obligado a pagar al trabajador o a sus beneficiarios los salarios que dicho trabajador hubiere devengado de haber sido reinstalado; además le responderá de todos los daños y perjuicios que le haya ocasionado. El trabajador o sus beneficiarios podrán instar y tramitar la correspondiente reclamación de reinstalación y/o daños en corte por acción ordinaria o mediante el procedimiento para reclamación de salarios, establecido en las secs. 3118 a 3132 del Título 32.

En torno el periodo de reserva de empleo y la obligación de reinstalación, el Tribunal Supremo de Puerto Rico en *Izagas Santos v. Family Drug Center*, 180 DPR 463 (2011), sostuvo:

"El objetivo de la reserva de empleo bajo SINOT es "garantizar al obrero que se incapacita temporalmente debido a una enfermedad o accidente no ocupacional, no sólo tranquilidad de espíritu y el sustento de él y de su familia por un tiempo determinado, sino el derecho a ser reinstalado". Aunque el

trabajador esté inhabilitado para realizar sus funciones, <u>la relación obrero-patronal sigue intacta mientras dure el periodo de reserva.</u> Esta reserva de doce (12) meses comienza a transcurrir a partir del momento en que el obrero se inhabilite para trabajar y se trata de un plazo de caducidad. Además, como estatuto reparador, estamos obligados a interpretarlo liberalmente a favor del trabajador. (Énfasis en el original.)

Así también, el TSPR en el referido caso advirtió:

"… no será justificación para despedir a un empleado durante el periodo de reserva el que éste no haya cumplido o que se prevea que no podrá cumplir con los requisitos de la reinstalación. De ser éste el caso, el patrono tendrá que esperar a que se extinga el período de reserva, salvo que exista justa causa bajo la Ley 80 para el despido."

## -III-

### A.

La señora López Cotto presenta, como primer error, que el TPI resolvió a base del Artículo 2.16 de la Ley Núm. 4 de 2017 y no a base de la Ley 80 de 1976. No incidió el TPI.

Según esbozado, la Ley Núm. 4 de 2017 que enmendó varios artículos de la Ley Núm. 80 es prospectiva cuando así se incorpora **expresamente** en el estatuto. El empleo de la Apelante concluyó el 8 de febrero de 2022, después de aprobada la ley. Por su parte, el Art. 2.16 de la Ley Núm. 4 dispone que el contrato de empleo se extinguirá por, entre otras cosas, la **incapacidad del empleado más allá del periodo de reserva de empleo.**[106] Nada dice sobre la aplicación prospectiva de este artículo, por lo que regula el despido de la Apelante.

Examinados cuidadosamente y en su totalidad las comparecencias de las partes y los documentos que acompañan las mismas, se adoptan por referencia los hechos consignados por el TPI en la sentencia recurrida.

---

[106] 29 LPRA sec. 122o.

Es un hecho incontrovertido que la señora López Cotto completó una solicitud de beneficios bajo SINOT que fue aprobada, con un periodo de incapacidad inicial del 4 de febrero de 2021 al 1 de mayo de 2021.

Surge del expediente que el 11 de noviembre de 2021, se le envió una comunicación a la Apelante donde se le informó que no era viable concederle un acomodo razonable, dado a su incapacidad de realizar las funciones de su puesto de enfermería de forma segura para sí, y de forma segura para los pacientes de la institución. A la señora López Cotto también se le comunicó que su reserva de empleo bajo SINOT estaría vigente hasta el 4 de febrero de 2022.

Luego de recibir esta carta, la Apelante no tuvo ninguna comunicación adicional con el Hospital, hasta el 8 de febrero de 2022. Es decir, BMC no recibió ninguna información o cambio en las limitaciones médicas de la señora López Cotto. Así las cosas, procedía concluir su relación luego de expirar su reserva de empleo y BMC quedó relevado de responsabilidad.

**B.**

Como su segundo planteamiento de error, la Apelante alega que el TPI incidió al no hacer determinaciones de hechos en cuanto a su fecha de contratación e ignorar todos los hechos alegados por ella en su oposición a la solicitud de sentencia sumaria y solicitud de sentencia sumaria parcial sobre hechos controvertidos. A la señora López Cotto no le asiste la razón.

La Regla 36.3 (c) de las de Procedimiento Civil, *supra*, dispone que: "Cuando se presente una moción de sentencia sumaria y se sostenga en la forma provista en esta Regla 36, la parte contraria no podrá descansar

solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica como lo haya hecho la parte promovente. De no hacerlo así, se dictará la sentencia sumaria en su contra **si procede**". (Énfasis suplido).

La Apelante adjudica error al TPI por ignorar su escrito y adjudicar la sentencia sumaria solicitada sin ulterior trámite. El que la parte no-promovente no presente oposición a la solicitud de sentencia sumaria, o la presente en violación a la Regla 36 de Procedimiento Civil, no hace al promovente acreedor *ipso facto* del remedio solicitado. Tanto las Reglas de Procedimiento Civil, como la jurisprudencia han establecido que se concederá el remedio si éste procede en derecho.

Por otro lado, el Apelada aduce que la oposición de la señora López Cotto a su solicitud de sentencia sumaria fue una en la cual la Apelante hizo unas conclusiones legales que no estaban avaladas por prueba admisible.

Ahora bien, el acoger o no el escrito en oposición resulta ser un ejercicio discrecional del magistrado, que al evaluar el mismo decide si cumple o no cumple. Por nuestra parte hemos examinado el escrito aludido y en ausencia de error manifiesto, prejuicio o abuso de discreción, no intervendremos con la decisión del TPI en cuanto a descartar las conclusiones legales.

## C.

La señora López Cotto presenta, como tercer y último error, que el TPI no hizo determinaciones de por qué la Apelante no es una persona cualificada bajo la Ley ADA y Ley 44 de 1991.

Surge del expediente que, la señora López Cotto trabajó para BMC desde febrero de 1987 hasta su despido el 8 de febrero de 2022. Al momento de su cesantía, la señora López Cotto se desempeñaba como Enfermera Graduada de BMC. Debido a una intervención quirúrgica en sus cervicales, la Apelante tuvo que recibir tratamiento médico y estuvo bajo descanso por SINOT por un (1) año. No obstante, la Apelante entiende que BMC falló al no proveerle un acomodo razonable para su condición y tras despedirle el 8 de febrero de 2022, justo cuatro (4) días después de la querellante terminar su periodo de descanso bajo SINOT.

En el presente caso, la señora López Cotto sostuvo una operación que la dejó permanentemente impedida. Recordemos que un empleado que alegue estar cobijado por la Ley Núm. 44, para que su patrono esté obligado a brindarle acomodo razonable según dispone la referida ley, tiene que demostrar que **está cualificado para llevar a cabo las funciones básicas de ese trabajo.**

Desafortunadamente, al no poder realizar las funciones esenciales de su empleo, la Apelante no es una persona cualificada bajo la Ley ADA y Ley 44 de 1991. El tercer error tampoco se cometió.

**-IV-**

Por las razones antes expuestas, se **confirma** la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones. El Juez Sánchez Ramos concurre sin opinión escrita.


*Lcda. Lilia M. Oquendo Solís*
*Secretaria del Tribunal de Apelaciones*